WALTER CHRISTENSEN, Appellant, v. E. R. HARRIS, Appellee.

CONTRACTS: Signing Without Reading. One who falsely represents
1    that a writing is an exact copy of an original contract, supposed to
     be lost, and *thereby* induces the signing of the same by one who
     could read, had an opportunity to read, but did not read, may not
     claim that his victim was negligent.

EVIDENCE: Relevancy, Competency, and Materiality. The giving of
2    a check "in full" discharge of an obligation may have material
     bearing on the subsequently raised issue as to the actual contract
     between the parties.

*Appeal from Cerro Gordo District Court.*—C. H. KELLEY, Judge.

DECEMBER 16, 1920.

ACTION in equity to foreclose a mechanics' lien.  Plaintiff's
petition was dismissed after a trial, and the plaintiff appeals.—
*Affirmed.*

*Senneff, Bliss, Witwer & Senneff,* for appellant.

*Blythe, Markley, Rule & Smith,* for appellee.

PRESTON, J.—1.  The petition alleges that, under a written
contract between the parties, plaintiff installed in the store build-
ing of defendant a hot water heating system, connected with the
public heating plant.  The contract price, as
1. CONTRACTS:
   signing with-      alleged by plaintiff, and the price or cost in the
   out reading.       proposals, accepted by defendant, as she claims,
was $628.  It is conceded that defendant paid $200 on the work
at one time, $250 at another, and that, after the work was done,
defendant paid by check $178, making a total of $628.  The
check reads that it is "in full."  The claim in this action is
for $142 as extras, for running new heating mains, pipe, ells,
labor, etc., which defendant claims were covered by and included
in the contract as actually made between the parties.  The
bill for extras was presented in three bills: one for $87.88, for

144 feet of pipe and covering; $48.64 for covering pipe; and
$5.48 for another item,—or a total of $142.  Plaintiff claims that
he presented these three bills to the defendant at the time he
asked a payment for the balance of the $628, and that she turned
down the claim for extras, and gave him a check for $178, recit-
ing that it was in full.  The defendant denies that the three
bills for extras were presented to her as claimed, but says that
only the first one was, and that this was after she had paid for
all the work; that the other two were never presented to her,
until, by letter from an attorney, the two additional bills were
included.  Defendant objected to the first bill for extras.  Plain-
tiff testifies:

"She didn't understand it; she didn't know what I meant
by it."

Defendant told him, at that time, that the $628 was in full,
and that she wanted a copy of the original contract,—that is,
the proposals and acceptance.  But instead of giving her a copy
of the proposals and acceptance, plaintiff turned the matter over
to an attorney for collection.  Such is defendant's claim.  The
manner of presenting these three bills separately for extras was
thought by the trial court to be unusual, and he denominated it
an afterthought.  It appears to us that it was at least unusual
to present them as defendant contends, or even as claimed by
plaintiff.  One bill is dated December 27th, and another, Decem-
ber 30th.  They all relate to the same subject-matter, and could
as well have been put in one bill, it seems to us. .The contract
as plaintiff claims it to be is as follows:

"An agreement entered into this 3d day of August, 1917,
by and between.Mrs. E. R. Harris, party of the first part, and
Walter Christensen, party of the second part, witnesseth:
Party of second part for and in consideration of $628, six hun-
dred and twenty-eight dollars, in payment as herein specified
agrees to furnish all material and labor necessary to install a
city heat system in the store now occupied by the Horse Shoe
Gro. Co.

"It is understood that the following material and labor
will be furnished by the party of second part.

"574 five hundred and seventy-four sq. ft. of 3 Col. 38" Pl H. W. Radiation divided into six units.

"Each radiator to be furnished with 2 1¼" N. P. Steam Radiator Valve, and one loose key air valve. All radiators to be silver bronzed. Run 1½" circuit with 1¼" chokers between each radiator in basement. Install ½" valves so as to drain system.

"Pipe fittings and etc. to install a complete job to be furnished by party of second part.

"*Party of first part to bring feed and return inside basement of own building.*

"*It is further agreed that if any changes are made from above contract that the party of first part will reimburse party of second part on the basis of time and material.*

"In consideration of the foregoing the party of first part agrees to pay the party of second part the sum of $628 when said job is completed.

"In witness of the foregoing, the party of aforesaid set their hand and seal to this and the other instrument of like tenor and date this 3d day of August, 1917.

" [Signed]                          [Signed]
 "E. R. Harris,                    Walter Christensen,
   "Party of First Part.          Party of Second Part."

It will be observed that this contract provides that for $628 plaintiff agrees to furnish all material and labor necessary to install a city heating system, etc., and that pipe, fittings, etc., to install a complete job, are to be furnished by party of the second part. While the paper bears date of August 3d, which is the same date as the typewritten proposals, it was not signed for some time afterwards. The original of this typewritten contract has been certified, and in it appear one or two changes, made with pen and ink. The defendant concedes that there were two changes made in the proposals: one of which is that there were to be furnished 2 1¼" N. P. steam radiator valves,—and the change from one to two such valves appears in pen and ink in the contract before set out; and further, that, if any changes were made in the drainage system, she would reimburse plaintiff on the basis of time and material. But

there was no change in the drainage system. The changes claimed by plaintiff were in regard to additional piping, and so on. The italicized part of the contract before set out does not appear in the typewritten duplicate proposals, and makes a material change therein. Defendant says that the part of the contract in italic was not agreed to, by the proposals, contract, or otherwise. She admits that her signature appears on the contract before set out, and that she supposed she was signing the proposal as an acceptance, and alleges that plaintiff, by fraud and misrepresentation, foisted upon her the contract sued on, and thus secured her signature. After admitting her ownership of the property and so on, and denying other allegations of the petition, defendant says in her answer that, desiring to install heating service from the pipes of the city heating plant, she submitted to plaintiff orally certain things she wanted done, describing them; that bids were asked and received from plaintiff and others; that plaintiff's proposal to defendant to do the work was in writing, but the proposals upon which the writing was based, were oral; that, on September 28, 1917, she wrote plaintiff as follows:

"Mr. Christensen: Will you please make me a duplicate copy of our contract for installing the heating system in my store, as I have lost mine through carelessness, and can't find it. Attach to the duplicate a codicil with these two changes: Instead of one Jenkins valve for each radiator, make it two so to comply with the P. G. & E. Co. regulations. Also, if any change is made in the drainage system, it will be made on the basis of time and material.

"Yours truly,
"E. R. Harris."

That, in response to said letter, plaintiff brought to defendant at her store what she supposed to be and believed to be a copy of the contract, or written proposals of the plaintiff; that said contract was represented orally to her to be exactly in accordance with the written proposals, and the contract between plaintiff and defendant; and that defendant, relying on the representations of plaintiff that the writing so brought was identical, and a duplicate of the writing before entered into

between them, signed the same; that defendant had no notice or knowledge that the contract or agreement was not in accordance with the written proposals of plaintiff which had been accepted by defendant, and that she was misled by plaintiff's misrepresentation that it was a duplicate copy of said proposals; that she never knowingly or intentionally entered into any other or different contract than the one contained in the written proposals of plaintiff on August 3, 1917, accepting the proposals, and agreeing to do the whole of said work, and to furnish all of the materials for the sum of $628. She says that she has paid plaintiff the full amount of said contract price, and is not indebted to the plaintiff in any sum. The defendant later found her copy of the proposals, and it was produced and offered in evidence. It should be said that the letter above set out bears date of September 28, 1918; but she claims it was 1917. It is probable that there is a mistake in the month, and in the day of the month, as well. The letter bears internal evidence that it was before 1918, because it was before the work done in December, 1917. Her explanation as to the mistake is not very satisfactory; and in fact she is unable to explain it satisfactorily. The exhibit has been certified, and it appears that she used old paper, one of the letterheads of her husband. The incompleted printed date was 189.., and over the 8 she has written a 9, and added 18, and then wrote the month and day of the month. At any rate, it is contended by defendant, as we understand it, that this letter was written before she signed the contract sued on by plaintiff.

It is claimed by plaintiff that he is entitled to recover, if the contract between the parties is as declared by him. The important question in the case is what the real contract was, and this is a question of fact. The principal legal question is as to whether defendant was negligent in signing the contract sued on, and whether she is bound by the contract because of negligent signing. The evidence is in sharp conflict, and every circumstance for or against either party is argued with considerable elaboration. There are some contradictions and inconsistencies in the testimony of both parties. We cannot take the space to go into the details of the evidence.

Defendant's two-story building fronts west, and extends

east to a private alley 10 feet wide, and then on east to the public alley in which is situated the heating main. These pipes went through the feed store basement. There were apartments in the second story, in which defendant lived. Prior to this transaction, the upper part was already supplied with heat, which connected with the mains of the city heating plant, in the alley, by a pair of pipes. The work contemplated was to heat the store building. The old pair of pipes extended west from the main in the alley to a point west of the private alley referred to, and into the basement or private cellar under defendant's store building. The new pipes extended further west. It is claimed by defendant that the new pipes were to connect with the old by means of a T, inside the feed store basement, just west of the public alley; while plaintiff claims that this connection was to be made at a point further west, and at a point west of the private alley. The new pipes as put in extend nearly to the west end of the basement. The theory is, as we understand it, that if, under the contract, the connection was to be made at the point as contended by defendant, it would make more pipe to be put in by plaintiff, under the contract as made, and that it is this extra pipe which plaintiff is seeking to charge for as a part of the extras. A part of the extras claimed for is for work outside of the building, from the main in the alley to the basement of the building.. The number of feet of pipe was not mentioned in the proposals or the contract, as plaintiff claims it was; but the pipe was to be furnished, as defendant contends, by the contractor. The written proposal by plaintiff recites:

"I will install city heat in your store building now being occupied by the Horse Shoe Grocery Company for the sum of $628. * * * said circuit to be installed so as to control first floor separately from second floor, also install bleeders so as to drain system. Pipe, fittings, labor, etc., to install a first-class job is included in this price."

It is contended by defendant that this proposal was accepted by her, and that she signed it, and that she signed a duplicate, she keeping one and plaintiff the other. The two proposals, plaintiff's and defendant's Exhibits C and E, have been certified. We think the appearance of them, and the manner in which they are gotten up, give color to and corroborate defendant's

claim that she thought she was signing the proposals as an acceptance, and that she supposed this paper was what plaintiff later presented to her as the contract sued on. The proposals were prepared by the plaintiff. They are typewritten, and plaintiff says his copy is a carbon copy. The defendant's copy, Exhibit E, ends with the words, "Yours very truly," and is signed by plaintiff and defendant at the lower right-hand corner of the sheet. Plaintiff's carbon copy does not contain the words "Yours very truly" at the bottom, and he alleges that this is because the paper used for the carbon copy was shorter than the other. On plaintiff's copy, at the bottom, after the type-writing, appears, written in pen and ink, at the left, the word "submitted," and under plaintiff's signature, and below that, a memorandum, "Please return to my office, W. C." At the right is the word "accepted," and a place for signature under-neath; but it is not signed. Had the defendant signed her name under the word "accepted" on plaintiff's copy, and returned the paper to him, this would have constituted a contract, and the contract between the parties. As said, her copy of the proposal is signed by her, and by the plaintiff as well. We think the reasonable inference is that plaintiff prepared his copy with the idea that defendant should sign it, and that this would constitute the contract. Thereafter, the contract sued on was presented to her for her signature, under circumstances which will be briefly related later in the opinion. Defendant testifies that plaintiff told her that the contract sued on was a duplicate of the proposals and acceptance which she had before signed, and that she signed the purported contract without reading all of it, and that she did not know of the provisions in the contract which are italicized. The plaintiff's memory was faulty at some points. For instance, when asked about the price of the pipe, he said that he had a certain number of feet of radiation, and then:

"Q. Do you remember what you figured it at? A. I can't remember those things," etc.

Defendant claims that, after plaintiff had entered on the work, and before the job was finished, someone suggested to her that she have the heating company put in another pipe, 10 or 12 feet long, extending through the wall from the main into

her basement, which cost $4.00 or $5.00, and which plaintiff objected to paying for, and which defendant agreed to and did pay for; that plaintiff then connected the pipe to this new main, instead of connecting it onto the old one by the use of a T; but that said connection did not make any more pipe than the one originally contemplated. As said, there are other circumstances for and against each, and more or less contradictions and inconsistencies in the evidence of both, and there is a square conflict between the parties. We shall not attempt to further discuss the side lights. It is concededly a close case on the facts. The trial court had the advantage of seeing the witnesses and their manner of testifying, and was thus in a better position to judge of the credibility than we can be. We give some weight to the finding of the trial court in an equity case; but such finding is not conclusive in such a case, as contended by appellee. Considering all the evidence and the circumstances, we are of opinion that the evidence preponderates in favor of the defendant, and that the contract is as she contends; and further, that the trial court did not err in finding that plaintiff was not entitled to receive pay for the extras.

2. It is contended by appellant that, under the evidence, defendant shows no sufficient excuse for signing the contract. without reading it; that she was negligent, and is bound. They state the rule to be that a party who is able to read, and who is not prevented from reading, is bound by the contract he signs. They cite *McCormack v. Molburg*, 43 Iowa 561, 562; *Wallace v. Chicago, St. P., M. & O. R. Co.*, 67 Iowa 547, 550; *McKinney v. Herrick*, 66 Iowa 414, 416; *Reid, Murdock & Co. v. Bradley*, 105 Iowa 220, 222; *Shores-Mueller Co. v. Lonning*, 159 Iowa 95, 98, 100. Appellee cites some of these cases to sustain her position, and claims that she was prevented by the plaintiff from reading the contract. It seems to us that, under the circumstances of this case, the rule as to negligence in signing ought not to apply in all its strictness, for the reason that the signing by defendant was of a mere copy, which she had requested plaintiff to make for her, but in which is contained a clause or sentence different from the original contract. This is the clause upon which plaintiff seeks to recover herein. The rights of the parties depended, in a sense, upon the original contract, so

far as the signing is concerned; so that the question here is more a question of fraud on the part of plaintiff in securing defendant's subsequent signature to a copy of the original contract, which copy, so far as this case is concerned, involves the change of one clause. There is little dispute between counsel as to the law. The question turns more upon the evidence. She says she started to read the contract, but did not read it all. She was about 69 or 70 years of age. As to the transaction of the signing of the contract sued on, she testifies that, after she had written him the letter purporting to be dated September 28th, plaintiff said:

" 'Here is your letter, and I brought over these copies; you wanted a duplicate copy of your contract, and,' he says, 'here it is.' "

She says further that defendant had the paper she signed, doubled up in such a way that she could not and did not see the parts heretofore shown in italic; that he said, further:

" 'Here is your duplicate,—better sign it,' he said; and I signed it, and he drew the other one out of his pocket. 'Now,' he said, 'as long as you have lost yours, we will have both of them alike, and now,' he says, 'sign this one, and I will have one just like it.' I was suffering intensely with my limb, and they were calling me in three or four directions. * * * I had three or four men and this man working in the basement, and plaintiff came rushing up with it. He says, 'Here is the letter I got from you, and here is the contracts that you wanted a duplicate of.' He was in a hurry, for he said his office was alone. * * * Just then my phone rang, and they were calling for me to come over to my sister's,—that she had fallen in a faint, and was very sick; and when I went back, I was going to finish reading the contract, and he doubles it up, so as to hide the clause he had put in. The phone rang again, and I went to it, and they told me to hurry over. I had my hat on, just ready to go, when he came in, and he said, 'Here are the contracts, and here is your duplicate,' he said; and I took it and commenced to read it, * * * I believed what he said; believed it was an exact copy. I never dreamed of getting a new contract. I just wanted a copy of the old one, to put in my day book."

She says she believed what he told her, and relied on his statements, or she would not have signed the contract. She and plaintiff were good friends, and he had, at one time, had a room in her apartment. We have not given all her testimony on the subject, but perhaps the substance, in a general way. Some of the circumstances she relates are not disputed. The vital points, however, are denied by the plaintiff. Defendant's son says he was present, but his testimony in regard to the transaction is not very definite. The plaintiff is corroborated to some extent by his stenographer as to some matters, although she was not present at the time of the signing of the contract. The defendant is corroborated to some extent circumstantially.

It is thought by appellant that defendant's evidence falls short of any misrepresentations as to the contents of the paper. We do not understand defendant to claim that there was misrepresentation as to the contents of the paper which she signed. Her claim is that he represented that it was another paper, to wit, the proposal. If her evidence is true, plaintiff made a direct affirmation that the paper he presented for her signature was the old contract, as she calls it, or the proposal. That is an entirely different paper, and the contents are different. Appellee claims that plaintiff's cases do not sustain his contention. They say that there was a false representation by plaintiff, and that he employed artifice and deception. In the *McCormack* case, the court said:

"The defendant does not state that plaintiffs used any artifice to prevent him from reading the contract. * * * In fact, no excuse whatever is given, except that he signed the contract, relying on the representation of plaintiffs as to its contents."

Under such circumstances, it was held that defendant was guilty of inexcusable neglect. In the *Wallace* case, the party signing did not claim that the contents were purposely misrepresented in the reading, or that he was deceived by any sleight of hand, legerdemain, or artifice. In the *McKinney* case, the court said that it was not stated in the answer that any misrepresentation was made as to the contents of the writing. In the *Reid, Murdock & Co. v. Bradley* case, supra, the defendant read the contract before signing, but sought to obviate

its effect by attempting to show that he did not know that certain terms were incorporated therein.

Appellee relies on *Shores-Mueller Co. v. Lonning*, supra, cited by appellant, and contends that it supports appellee's contention. Appellee quotes from that case as follows:

"As a general rule, one should never sign an instrument without reading it, and, if he cannot read, he should have it read to him; and in the absence of fraud or misrepresentation, if he does not read or have it read, the law will  *  *  *  not permit him to say that he did not read, and that it contains something different from what he supposed it did. But if the instrument is fraudulently read to him in terms different from the real ones, or if, by trick or fraud, another is substituted in its place, or if, not being read, its terms are fraudulently misrepresented, and he cannot read himself, or is otherwise without laches on his part, he is not bound, although he signs. These propositions are well sustained by authority."

Appellee cites *Sutton v. Greiner*, 177 Iowa 532, where, at page 540, it was said:

"Plaintiff further asked the court to instruct the jury that, to sustain the defense, it must be shown not only that the alleged false representations were made by plaintiff, but that they were of such nature or character as to deceive an ordinarily prudent person, and that it must further appear that defendant 'was free from any negligence in relying thereon.' It is to be conceded that authorities substantially to this effect may be found, but it is equally true that the rule, as broadly stated by counsel, is now generally repudiated by the courts.  *  *  *  The more reasonable and just rule is that, as between the parties to a contract obtained by fraud and deceit, the party making a misrepresentation for the purpose of inducing another to act will not be heard to say that his false statement ought not to have been believed. *Riley v. Bell*, 120 Iowa 618; *Hetland v. Bilstad*, 140 Iowa 411, 420; *Howerton v. Augustine*, 145 Iowa 246, 248."

See, also, *Burlington Lbr. Co. v. Evans Lbr. Co.*, 100 Iowa 469. In *Tait v. Locke*, 130 Mo. App. 273 (109 S. W. 105), the court said:

"We know of no case in which it was ruled that the actual misreading of a paper purporting to contain a contract, thereby inducing the signing of it, was not a fraud which the signer might set up in defense, even though he could have read the paper himself. Such a betrayal of confidence is revolting, and so infrequent that it is not likely to be anticipated."

Appellee cites numerous other cases to the same effect. We think the court did not err in permitting defendant to show what the actual contract was, in the face of the signed writing; and we are of opinion that, under the record, the defendant ought not to be bound, because of her alleged negligence in signing the contract.

It is thought by appellant that the fact that defendant gave a check for $178 in full should not be given significance, because, as they say, the claim was for extras. They say, in argument, that there never was any question but that the work done under the contract had been paid for. The answer of defendant before set out pleads payment, and claims that the work now claimed for as extras was included in the contract. At any rate, we think the check so written has a bearing on the question as to what the contract really was.

*2. EVIDENCE: relevancy, competency, and materiality.*

We have not attempted to discuss all the details of the matters raised in argument. The opinion is already too long; and, without further discussion, we reach the conclusion that we would not be justified in interfering with the finding and decree of the district court. The judgment is, therefore,—*Affirmed.*

WEAVER, C. J., LADD, EVANS, STEVENS, and ARTHUR, JJ., concur.

WEAVER, C. J. (concurring). I note this concurrence, to emphasize my position that the doctrine which makes it possible for one person to commit an outrageous wrong upon another, by inducing him or her to act to his or her injury by grossly false representation, and then to come into court and receive judicial absolution for his wrong, upon the plea that the victim of his fraud ought not to have believed him, is as unsound in law as it is in morals.

SALINGER, J.—(dissenting). I. The majority rightly declares that the law question is, What effect should be given to the fact that defendant did not read what she signed? I differ from its conclusion that this failure is of no consequence.

In *Bannister v. McIntire*, 112 Iowa 600, at 604, we quote with approval from *Bonnot Co. v. Newman Bros.*, 108 Iowa 158:

"While persons, on the faith of another's word alone, every day sign contracts without reading them, the law has ever adjudged this such indifference as will preclude a remedy in event of deception."

And we held, in *McCormack v. Molburg*, 43 Iowa 561, at 562, that such indifference "is inexcusable neglect, and the defendant must suffer the consequences of his own folly." We said in *Shores-Mueller Co. v. Lonning*, 159 Iowa 95, 100, that there is a duty to read, and that, as a rule, if one who signs is able to read, has opportunity to read, and omits to do so because of the statements of his adversary concerning the contents of the instrument, "his negligence will estop him from claiming that the instrument is not binding." For this, citation is made of *Bannister v. McIntire*, 112 Iowa 600; *Wallace v. Chicago, St. P., M. & O. R. Co.*, 67 Iowa 547; *Gulliher v. Chicago, R. I. & P. R. Co.*, 59 Iowa 416; and *Reid, Murdock & Co. v. Bradley*, 105 Iowa 220. We said, in *McCormack v. Molburg*, 43 Iowa 561, at 563:

"With scarcely an exception, where the rule has apparently been recognized different from that herein established, some such exception [inability to read the English language or to read] will be found to exist, or some artifice used to obtain the signature of the party, or to prevent him from reading the contract."

It may be said that the rule which estops because of reliance on the statements of one opposed in interest is in conflict with other well-settled rules. This, too, is disposed of in *Shores-Mueller Co. v. Lonning*, 159 Iowa 95, at 100, by the declaration that, so far as a plea for relief on account of having signed on the representation of an adversary in interest is concerned, there is no room to apply the rule "that it is no defense for one guilty of a fraud to say that the other party was negligent in believing him." As to this, the *Shores* case says:

"We have so long adhered to the doctrine just stated [that such representations may not be relied on] that we are not justified in departing from it now."

There must be a prevention. It is not enough that one sign because the other fraudulently represented that the thing signed was something other than it in fact was. Such representation constitutes fraud. But, where the fraud is effective solely because one does not read when he might, it cannot be an avoidance that one did not read. The two things are distinct. The false representation as to contents is the fraudulent act. The failure to read is an avoidance, though the act be fraudulent. In other words, fraud is not actionable, if it could not have been injurious were it not for the neglect of the defrauded party. See *McCormack v. Molburg*, 43 Iowa 561, at 562; *Bannister v. McIntire*, 112 Iowa 600, 604. When it comes to avoidance of fraud if it be assumed to exist, it cannot, of course, avail to say that a fraud was committed. Whenever the law makes the omitting to do a stated thing an avoidance of fraud, no matter how black, of course it remains such avoidance, no matter how black the fraud. A rule that is available only if fraud be found, and which is operative though fraud be found, would not be a rule at all, if it were inapplicable because fraud was found. See *Spitler v. Perry Town Lot & Imp. Co.*, 189 Iowa 709.

It follows of necessity that the failure to read is not avoided by showing that a representation as to the contents of the paper was relied on. Such representation and reliance work the fraud, but do not excuse the negligence in failing to do what would have made such fraud harmless. This is especially so where the parties have conflicting interests. It militates strongly against the one who claims fraud that he asserts he was misled by the representations of one who had an adverse interest. This thought is clearly put in *Green v. Wilkie*, 98 Iowa 74, at 80, by pointing out that the representer in that case was naturally more readily relied on because apparently he had absolutely no interest in the business to be done. The same thought is emphasized in *Wallace v. Chicago, St. P., M. & O. R. Co.*, 67 Iowa 547, at 550, where it is pointed out that the claim that a paper which proved to be a release, when it was represented to be merely a voucher for back pay, was signed on representation by

the agent of the railroad. To like effect is *Och v. Missouri, K. & T. R. Co.*, 130 Mo. 27 (31 S. W. 962). And so of *Bannister v. McIntire*, 112 Iowa 600, 601, where a sheriff signed a written admission of liability which would take a claim out of the statute of limitations, and did so without reading it, and upon the representation of attorneys other than his own that the purpose of the paper was to protect their client against assertions by a railroad company. And in *Shores-Mueller Co. v. Lonning*, 159 Iowa 95, 100, some emphasis is laid on the fact that the reliance was on the statement of an adversary. And see *McCormack v. Molburg*, 43 Iowa 561, at 562. Here, though the parties may have been good friends, and plaintiff had at one time had a room in defendant's apartment, there was no confidential relation, and their interests were adverse.

As said in *Crim v. Crim*, 162 Mo. 544 (63 S. W. 491), to permit a party, when sued on a written contract which he admits he signed, to deny that it expressed the agreement he made, merely because he did not read the paper he signed, and, therefore, did not know its stipulations, would absolutely destroy the value of all contracts and negotiable instruments. We held, in *McCormack's* case, 43 Iowa 561, at 562, "that such indifference is inexcusable neglect, and the defendant must suffer the consequences of his own folly." In *Reid, Murdock & Co. v. Bradley*, 105 Iowa 220, at 225, we say this language is peculiarly applicable, and that the effect of any other rule "would be to render written contracts of but little practical value over those existing in parol only."

II. It is a self-evident proposition that any avoidance which is held to be insufficient to make an issue for a jury cannot be sustained on review *de novo*. And it seems to me we have time and again held that a stronger showing than this defendant has made will not even sustain a verdict under the rules which govern appellate review of verdicts. The following are some of them:

In *Wallace v. Chicago, St. P., M. & O. R. Co.*, 67 Iowa 547, it was testified, in substance, that, when certain writings were signed, they were not read over, but that the agent of the adversary who procured this signature stated to the maker that the paper he was signing was a voucher for his back pay; that the.

signing was done without knowledge of the contents of what
was signed; and that, thereafter, the papers signed proved to be
a release. We held that, since plaintiff had the capacity to read
the release signed by him, had opportunity to do so, and no
fraud preventing him from reading was practiced, that then,
though he chose to rely upon what the other said about it, the
signer was estopped by his own negligence from claiming that
the paper was not binding upon him, according to its terms. In
*Bannister v. McIntire,* 112 Iowa 600, a sheriff who had money
on deposit with him as damages for a railroad right of way,
signed, without reading, a written admission of liability and a
promise to pay, which took the claim out of the statute of limita-
tions, the attorneys of the promisee saying to him the signing
was merely to protect their client against the railroad. In
*McCormack v. Molburg,* 43 Iowa 561, the claim was that the
plaintiffs "falsely and fraudulently pretended to reduce said
verbal contract [one asserted to have been previously orally
made] to writing, as they falsely assured this defendant. The
plaintiffs at the time knew the same were false, and then induced
said defendant to sign the same, * * * defendant believing,
at the time of signing the same, that it fairly expressed and con-
tained the said above-described verbal contract." We held that
this, if proven, would not make a case for the jury, because, for
one thing, there is no statement that the signer "was unac-
quainted with the English language, or that he could not read;"
and that, "in fact, no excuse whatever is given, except that
he signed the contract, relying on the representation of plain-
tiffs as to its contents;" and that this "is inexcusable neglect,
and the defendant must suffer the consequences of his own
folly." In *Jenkins v. Clyde Coal Co.,* 82 Iowa 618, at 621, it
is held, on the authority of *McKinney v. Herrick,* 66 Iowa 414,
and *McCormack v. Molburg,* 43 Iowa 561, that where, though
the eyesight of the plaintiff was not good, it clearly appears he
could have read the instrument, had he desired to do so, before
he signed, then he cannot escape its provisions, although he
testified he was misled by the statements of the manager of the
company that the writing corresponded with an earlier one made
in parol, and he was made to believe that the instrument was
a mere receipt for $500 paid; and that he signed a surrender of

lease without an intention of such surrender. And we held that a letter tending to show the earlier agreement aforesaid should have been excluded from the consideration of the jury: this, though there was plea that the representations aforesaid were false, and that he was induced to sign though the other party knew the same to be false, the representation being that the contract signed, "expressed and contained the said above-described verbal contract." In *Och v. Missouri, K. & T. R. Co.,* 130 Mo. 27 (31 S. W. 962, at 966), the agent of the other party falsely represented that certain erasures which he was making made the paper signed conform to what had been the understanding of the parties. In *Reid, Murdock & Co. v. Bradley,* 105 Iowa 220, 221, 223, the other party directed the signer where to make erasure of clauses, and represented that, when these erasures were made, it would strike out certain matters covering antecedent debts, when, in truth, it struck out but one of these matters. We said:

"   *   *   *   after having erased the words to which we have referred. The credit man's attention was called to the erasure, and there is no doubt in our minds that Bradley thought he had so changed the contract as that it applied to future indebtedness only. It is likely that the credit man directed Bradley to the place where the erasures should be made, but of this there is some doubt. This much does appear, however; that Bradley was able to read and write, and had full opportunity before signing to read the document.   *   *   *   Appellant says that the mistake in the signing of the contract was due to oversight in not reading it over more closely, and gives as his only excuse for not doing so: *First,* the statement of the credit man; *second,* that 'he [the credit man] kept nagging the life out of me, and it was dark in the room, and he pointed to the paper, and said, "Scratch out that line there, being as to past purchases," and I scratched it out and signed it.' "

We held there was no case to submit to a jury.

### 2-a

Typical cases wherein it was held that the issues should go to the jury are as persuasive against sustaining the avoidance made in this case as are the cases wherein it was held that there

was not enough to send the question of excuse or avoidance to the jury. As pointed out in *Gulliher v. Chicago, R. I. & P. R. Co.,* 59 Iowa 416, at 422, the case of *Hopkins v. Hawkeye Ins. Co.,* 57 Iowa 203, was held to be for a jury because the signer, who relied on the agent of the other to read the paper to him, was unable to read writing, on account of having lost his spectacles, and testified that the instrument was read to him falsely, and with intent to defraud him. In *Sims v. Bice,* 67 Ill. 88, signer could not read writing readily. In *Trambly v. Ricard,* 130 Mass. 259, the signer was unable to read or write, and affixed his signature by mark. In *Shores-Mueller Co. v. Lonning,* 159 Iowa 95, 100, 101, we sustained submission to the jury because the jury was justified in finding that the signers could not read or write the English language, and that an instrument in fact operating to create a suretyship obligation was represented to be simply a certificate as to the reputation or character of Lonning, the signer having expressly stated that, if it was a security, he would not sign. It is said, among other things, that such cases should go to the jury if the instrument is fraudulently read, or if, by trick or fraud, a different paper is substituted, and the signer cannot read himself, and is otherwise without laches. We held, in *Dashiel v. Harshman,* 113 Iowa 283, that, where plaintiff, a woman advanced in years, had defective eyesight, executed a quitclaim deed for a nominal consideration, relying on the representations of the grantee that the deed would not affect her land or title thereto in any manner, she being unacquainted with the description of her land, because her patent had been destroyed by fire, years ago, and though she objected to signing the deed until she had shown it to her attorney, to see if it was all right, yet defendant induced her to sign then and there, by making this false representation, it was for the jury whether she was not negligent in not ascertaining the contents of the deed. True, in the isolated case of *Tait v. Locke,* 130 Mo. App. 273 (109 S. W. 105), there is the following broad language:

"We know of no case in which it was ruled that the actual misreading of a paper purporting to contain a contract, thereby inducing the signing of it, was not a fraud which the signer

might set up in defense, even though he could have read the paper himself. Such a betrayal of confidence is revolting, and so infrequent that it is not likely to be anticipated."

If this be, indeed, a contradiction of well-settled rules to which reference has been made, it would seem to stand alone, and would be in conflict with other cases in the same jurisdiction.

III. It is to be doubted whether the majority means to dissent from the foregoing law propositions. The remaining inquiry, therefore, is whether the evidence can rightly be held to excuse defendant. At the outset, it is to be said that defendant is not entitled to have the evidence weighed, beyond ascertaining whether she has sustained her plea of avoidance. In other words, if that plea asserts no preventing trick or device, and limits itself to charging that a false representation was made as to what she was signing, then it is settled, as matter of law, without resort to the evidence, that failure to read has not been excused. What is her plea? She answers that, in response to said letter, plaintiff brought to defendant, at her store, what she supposed and believed to be a copy of plaintiff's proposal, but which was the contract set out in plaintiff's petition; that the plaintiff orally represented that said contract was identical, and the duplicate copy of plaintiff's written proposal aforesaid; that the defendant relied upon said representation, and signed the said contract; and that the defendant never knowingly or intentionally entered into any other or different contract than the one contained in the written proposal of plaintiff, agreeing to do the whole of the said work and to furnish all of the materials for the sum of $628. A similar answer was held insufficient in *McKinney v. Herrick,* 66 Iowa 414, at 416.

### 3-a

Passing that, upon the majority opinion itself the testimony is in equipoise. It is therein stated that there are some contradictions and inconsistencies in the testimony of both parties; that there are other circumstances for and against each, and more or less contradictoriness and inconsistency in the testimony of both; further, that, while the memory of the plaintiff is at

fault at some points, he is corroborated to some extent by his
stenographer; and that, on the other hand, defendant is corrob-
orated, to some extent, circumstantially. Finally, it is stated
that, on all vital points, the plaintiff makes denial.

Now, there is a presumption that the instrument signed
was read, and that the signer knew its contents. *Smyth v. Mun-
roe,* 84 N. Y. 354. The burden rests upon the signer to show
that the execution was obtained by fraud and deceit. *Och v.
Missouri, K & T. R. Co.,* 130 Mo. 27 (31 S. W.. 962, at 966).
And we held, in *Chirurg v. Ames,* 138 Iowa 697, at 706, that this
burden is discharged only if the one who asserts fraud makes
out her case "by clear and satisfactory evidence." In dealing
with this point, appellee says, while it is true that Mr. Christen-
sen and his stenographer to some extent "contradict this," it
was a question of fact for the court to decide whether or not
the contentions of the plaintiff or defendant were correct, and,
if the defendant's contentions were correct, then "plainly Mr.
Christensen had no right to recover anything from her, as he
had been paid in full." This ignores utterly that appellant is
entitled to review *de novo.*

IV. Defendant testifies that plaintiff, on coming, said:

" 'Here is your letter, and I brought over these copies; you
wanted a duplicate copy of your contract, and here it is. * * *
Here are the contracts, and here is your duplicate. * * *
Better sign it.' * * * And he drew the other one out of his
pocket, and said, 'As long as you have lost yours, we will have
both of them alike. Sign this one, and I will have one just like
it;' " that, when she signed, it was represented that she was
signing something which was exactly in accord with the original
written proposals and contract, and that she relied on the repre-
sentations of plaintiff to the effect that the writing brought to
her, and which she signed, was an exact duplicate of the earlier
writing entered into between the parties; that plaintiff had the
papers doubled up in such way that she could not and did not
see the parts which differ from the original written proposal. She
testifies that she never dreamed of getting a new contract, and
that all she wanted "was a copy of the old one to put in my
day book;" and never knowingly entered into any contract
other than the one contained in the original written proposal.

Eliminate the "doubling" of the paper, the claim that appellant had been ailing and was sick at the time, the fact that defendant is nearly 70, and certain asserted distractions which will presently be noted, and the proof just sustains the plea,—is nothing but evidence that plaintiff induced defendant to sign by falsely representing that she was signing something that worked no unauthorized change in existing obligations. It will hardly be claimed that this much will excuse the failure to read. If there was any "prevention," we must find it in other evidence. Is there any?

There was no prevention at first, because defendant testifies that she started to read the paper; that she took it and commenced to read it, but did not finish it. Manifestly, then, if there was any prevention, it must have occurred after she had been permitted to read part way. No matter what the plaintiff said in the first instance, no matter how much doubling up of the paper he did, that neither induced reliance nor prevented reading. Neither does it matter that she had her hat on and was just ready to go when defendant came, made his alleged representations, and told her to sign; nor that she was "ill." For, as has just been seen, despite the representations, and despite the alleged folding up of the papers, and being ill, and having the hat on, defendant did start to read. If, then, there be prevention that destroys the avoidance attempted by the plaintiff, it must be by something done by or chargeable to him which induced the defendant to abandon further reading. What, then, is there left for the claim of prevention? What done by plaintiff "prevented reading the contract," to use the words of the majority opinion? What did plaintiff do to stop further reading? As said, everything so far commented on did not stop reading, because defendant started to read. I repeat, What else is there of any act on part of the plaintiff that even tended to stop further reading? Not a word can be found to the effect that plaintiff did anything, although it may be granted, *arguendo,* that things other than any act on the part of plaintiff may have had a tendency to explain why the reading was, for the time being, stopped. After defendant started reading, three or four men and a man working in the basement were calling defendant "in three or four directions;" and then the phone

called her to come to her sister, who, she was advised, had fallen into a faint, and was very sick. Assume this can be imputed to plaintiff. But we have the further testimony of the defendant that she finally did return from the sister, "and when I went back, I was going to finish reading the contract, and he doubles it up so as to hide the clause he had put in. The phone rang again, and I went to it, and they told me to hurry over." Leave out the one statement that, when she returned, this doubling over was repeated, and it is made clear to a demonstration that nothing in the world interfered with reading what she signed before that. She had not signed when she went away the first time, in response to the telephone call. She had not signed when the three or four men were calling her in three or four different directions. The statement that the doubling over process was repeated when she returned, is denied, and is utterly against reason. But assume it to be true. She had started to read after the first doubling; she could see, according to her own story, that something was being doubled up in such way as made it difficult for her to see what she was signing. She was back from her sister; the three or four men had stopped calling. What was there, either in her own infirmity or in anything to which reference has been made, that prevented her from reading before she finally appended her signature? When all is said, there must be an infirmity or device that works prevention. *Wallace v. Chicago, St. P., M. & O. R. Co.*, 67 Iowa 547, at 550. What was there in anything the evidence shows that prevented defendant from finishing her reading, or having her son, who was present, read this paper? He does not seem to have been ill, or to have been distracted by anything.

The case falls fairly within the rule of the cases I have cited, where the agent of the other party induced signing what, either by erasure or otherwise, changed existing obligation, and in which it was held the contract could not be avoided because such agent falsely represented the actual contents of what was signed. In the *Reid* case, 105 Iowa 220, 223, which has already had full comment, a quite similar, but stronger case could not even reach a jury—much less be sustainable *de novo*.

One may well wonder what the profession will think, the

next time we shall, without reference to this majority opinion, once more announce that what is here held to be an excuse is not an excuse.