MIDLAND MORTGAGE COMPANY, Appellant, v. JAMES RICE et al., Appellees.

CONTRACTS: Validity of Assent—Signing Without Reading. A party
1  is conclusively bound by instruments signed by him without reading, when he has ample ability and opportunity to read, and when no fraud is interposed against the full exercise of such ability and opportunity.

REFORMATION OF INSTRUMENTS: Right in General—Total Denial
2  of Contract. There may not be a reformation of a contract in favor of a party whose entire contention is bottomed on the claim that *no* contract ever existed.

*Appeal from Benton District Court.*—B. F. CUMMINGS, Judge.

APRIL 1, 1924.

ACTION in equity upon a series of promissory notes and to foreclose a mortgage on real property. Decree in favor of defendants, and plaintiff appeals.—*Reversed and remanded.*

*Johnson, Donnelly & Lynch,* for appellant.

*Tobin, Tobin & Tobin,* for appellees.

STEVENS, J.—This is an action upon 20 promissory commission notes for $90 each, and to foreclose a second mortgage upon a farm of 120 acres in Benton County, executed to secure the

1. CONTRACTS: validity of assent: signing without reading.

payment thereof, and also upon a semiannual interest coupon of $360, due upon the principal loan of $12,000, which is also secured by a first mortgage upon the Benton County land.

The answer consists of general and specific denials and of certain affirmative allegations attempting to plead fraud in the inception of the instruments. A motion was filed to strike all of the allegations of the answer charging fraud, upon the grounds that they were incompetent, immaterial, and irrelevant, constituted no defense, and consisted only of mere legal conclusions. The motion was overruled, and the case tried, resulting in a decree canceling the notes and mortgage, and a judgment upon the tender of appellees for $180, the amount claimed to be due as commission. The motion to strike presents one of the principal propositions relied upon by appellant for reversal. The appellant, the Midland Mortgage Company, is a corporation having its principal place of business at Cedar Rapids, and is engaged in the business of loaning money. All of the transactions involved in this case were conducted on behalf of the corporation by F. C. Waples, its president. The papers were all executed by appellees on the forenoon of October 24, 1921, at the office of appellant, in the presence of an employee. The contention of appellees is that it was orally agreed, at the time application was made for the loan, that the rate of interest on the principal sum would be 6 per cent, payable semiannually, plus a commission of 1½ per cent, or $180. Appellees further charge that, if they signed the instruments in controversy, their signatures "were obtained by trickery, fraud, and deception, and without the knowledge or consent of these defendants," and also that the commission actually charged, that is, of $1,800, the aggregate amount of the $90 notes, is oppressive and unconscionable; and, as affirmative relief, asked the cancellation of

the notes and mortgage, or their reformation so as to express the true agreement and intention of the parties.

We need devote but little discussion to the question of pleading. It is the rule in this state that a plea of fraud must contain a statement of the facts upon which the allegations thereof are based, and that the averment of mere legal conclusions is not enough. *Ockendon v. Barnes,* 43 Iowa 615; *Stephens v. City of Marion,* 132 Iowa 490; *Conway Bros. v. Iowa Hdw. Mut. Ins. Assn.,* 190 Iowa 1369; *In re Estate of Rule,* 178 Iowa 184. In view, however, of the conclusion reached in this case upon the merits, we do not deem it necessary to review the ruling of the court upon the motion to strike. Any further material facts will be found stated in the course of the opinion.

There is no denial of the signatures upon the instruments involved in this action, nor do the claims of appellees in any way challenge the validity of the $12,000 note and mortgage. The controversy is limited to the twenty so-called commission notes and the mortgage executed to secure their payment. The issues of fact at this point involve primarily the terms of the agreement which was consummated by the execution of the $12,000 note and mortgage and the instruments in suit. Appellees testified that the loan was to be for a term of ten years, at 6 per cent, with a commission of 1½ per cent, or $180. The opposing claim, which was supported by the testimony of Waples, is that the rate was to be 7½ per cent, evidenced by the principal note of $12,000 at 6 per cent, and 20 semiannual coupon notes for $90 each, secured by a second mortgage upon the farm. Appellees denied that anything was said as to how or when the commission was to be paid, and affirm that they expected that appellant would deduct the amount from the net proceeds of the loan, after paying a certain incumbrance upon the land for which it was in part secured.

The acts, conduct, and representations of Waples which appellees charge induced them to execute the instruments in suit, and but for which they assert they never would have done so, are but little broader than the allegations of the petition. Appellants contend that no evidence of fraud was introduced, and that, in any event, appellees were guilty of inexcusable negli-

gence in signing the papers without reading them or otherwise ascertaining their purport and nature. The law on the points discussed is well settled. The duty imposed upon one about to sign a written instrument is well settled in *Garner v. Johns,* 182 Iowa 684, and other cases, a partial list of which is as follows: *Shores-Mueller Co. v. Lonning,* 159 Iowa 95; *Sutton v. Risser,* 104 Iowa 631; *Wallace v. Chicago, St. P., M. & O. R. Co.,* 67 Iowa 547; *McKinney v. Herrick,* 66 Iowa 414; *Jenkins v. Clyde Coal Co.,* 82 Iowa 618; *Mower Harwood Cr. & Dairy Sup. Co. v. Hill,* 135 Iowa 600; *Palo Alto Stock Farm v. Brooker,* 131 Iowa 229; *Houchin v. Auracher,* 194 Iowa 606; *Bank of Holmes v. Thompson,* 192 Iowa 1032. We quote from *Garner v. Johns,* as follows:

"If one in entering into a written agreement does not understand its terms, he may, in the exercise of ordinary prudence, be required to ascertain, on the advice of others more capable than himself, its true meaning, and, on failure so to do, be held guilty of negligence precluding him from asserting ignorance with respect to any part of such agreement; for the rule obtains in this state that, if a party can read, or if, by the exercise of reasonable diligence, he might have ascertained the defect in an instrument complained of, he is bound thereby, being conclusively presumed to know its contents."

If, however, the party signing is prevented, by some artifice, deception, or fraud on the part of the opposite party, from reading or ascertaining the contents and effect of the writing, the rule above stated does not apply. *Lundean v. Hamilton,* 184 Iowa 907; *Christensen v. Harris,* 190 Iowa 256; *Brown v. Hunt & Shuetz Co.,* 163 Iowa 637; *Merriam v. Leeper,* 192 Iowa 587; *Klingensmith v. Klingensmith,* 193 Iowa 350; *Burlington Lbr. Co. v. Evans Lbr. Co.,* 100 Iowa 469.

The evidence as to what was said between Rice and Waples on the day the papers were executed is in direct conflict. Appellees reside in Benton County, and went to Cedar Rapids on the day in question, in response to a prior arrangement with Waples. They arrived at the office of appellant shortly after 11 o'clock. Describing what was said and done on this occasion, James Rice testified, in chief and redirect:

"Well, there wasn't nobody there but me and my wife. But

we went down there in the morning, and he asked me if we came down to sign up, and I said we did. 'Well,' he said, 'If you do today, you have got to do it in a hurry, because I have got to go out in the country this afternoon;' and that was very near the noon hour. * * * Why, I and my wife went in his office,—he called in his office, private office,—and he says, 'Did you come down to sign this morning?' and I says, 'Yes.' He says, 'If you do, you have got to do it in a hurry, because I have got to go out in the country this afternoon.' And I says, 'It will be to-day the same as it was the other day, will it,—six per cent for the principal and one and a half per cent commission?' He says, 'That is it.' "

In cross-examination he testified:

"When my wife and myself went to Cedar Rapids, we got to the office about 11:30, and went into Mr. Waples' private office. I introduced Mrs. Rice, and he said, 'Did you come down to sign up this morning?' I said, 'Yes,' and he said, 'If you did, you will have to do it in a hurry, because I have to go out in the country this afternoon.' I said, 'I don't like to take any more time.' He called the girl then, and told her to get two places ready. I could read and write, and had lived in Benton County forty-nine years. During the last twenty-five years, have owned land and executed mortgages. Have executed mortgages to other loan companies, and different times have executed mortgage bonds and notes. When I signed Exhibits 1 to 20 inclusive, they were all in blank; just a blank form; no writing except what I wrote,—they wasn't filled out. Exhibit 21 hadn't anything in it at all, when I signed it,—just a place to sign. I never knew I signed that mortgage."

The version of the transaction as testified to by Mrs. Rice was as follows:

"Well, we went to Mr. Waples' office, and he asked us to come down to sign. My husband asked him if the papers were ready. He said, 'No.' He says, 'If you are going to sign up to-day, you will have to sign in a hurry.' So then Mr. Rice says to him, 'Remember, it is $180 for the loan, six per cent interest on the principal;' and he says, 'That is right.' "

James Rice also testified that there was a mortgage of $9,000 on the Benton County farm, on which he was paying interest at

5½ per cent; that he was also indebted to the Farmers National Bank of Vinton for $3,500 or $4,000, which was unsecured, and on which he was paying interest at the rate of 7 per cent; that the arrangement between himself and Waples was that the loan secured was to bear interest at the rate of 6 per cent, and that he agreed to pay a commission of 1½ per cent, or $180.

Appellees were placed at opposite tables in the office at the time the papers were signed, at the suggestion of Waples. The only person present during this time was the employee who assisted appellees by transferring the notes and mortgages from one to the other as the signatures were affixed thereto. No money was received by appellees at the time the papers were executed. The proceeds were to be applied by appellant, first, to the payment of certain expenses incident to the transaction, and to the discharge of the existing mortgage. The balance was to be remitted to appellee. Two remittances were received, one of $898.20 and one of $2,000. Accompanying the final remittance was a statement of the deductions made from the loan. Included therein was an item as follows: "Recording commission mortgage $1.20." Appellee admitted receiving a statement, but was unable to produce it upon the trial. A purported copy was introduced by appellant. This statement bears date November 25th. A letter purporting to have been written by James Rice, and bearing date December 11, 1921, was also introduced by appellant. Rice denied that he wrote the letter or had any knowledge whatever concerning it. In this letter, complaint is made of the expense on account of the abstract. The letter also contained the following language: "Everything was satisfactory except the work on the abstract." Both appellees testified that they did not know they signed the mortgage in suit, and that they understood and believed that the papers they were executing correctly represented the agreement as to the terms and conditions of the loan as previously discussed between James Rice and Waples.

James Rice testified that he noticed, when the final remittance was received, November 26th, that no deduction had been made for commission, but that he gave the matter no further concern until the following May, when, upon a visit to the county recorder's office, he for the first time learned of the existence of the

second mortgage. There is no evidence whatever that any artifice or deception was practiced at the time the instruments were signed, to prevent appellees from reading them or from ascertaining and knowing absolutely what they were. The testimony of James Rice that they were all signed in blank is evidently a mistake. In the course of his own testimony upon cross-examination, he testified that he did not examine the papers, but that, in observing them, he saw "the biggest one." If the mortgages were blank, they could not have been thus distinguished. In addition, Exhibits 1 and 2,—that is, two of the $90 notes, due May 1 and October 1, 1922, respectively,—are signed both "Elizabeth Rice" and "Lizzie Rice." This is explained by Mrs. Rice. The employee of appellant who was assisting appellees in the execution of the papers observed that Mrs. Rice was signing them "Elizabeth Rice." Thereupon, her attention was called to the fact that the papers were made out in the name of "Lizzie Rice," and that she should sign them in that way. The two notes were re-signed, and the rest of the series were signed "Lizzie Rice." Upon the theory of appellees, but one mortgage and one series of notes were contemplated; yet the large number of instruments signed were practically double the number that would have been executed upon this theory. According to the testimony of appellees, they expected the commission to be deducted from the loan, and, therefore, there could have been no agreement for the execution of either the notes or mortgage in controversy. Waples was not present at the time the instruments were signed, but we gather from the evidence that he was somewhere about the office. So far as anything is disclosed by the record, it was quite immaterial whether Waples was at the office or in the country when the papers were executed. The acknowledgments were taken by Grace Chapman, a notary public. There was, therefore, no occasion for haste, and this must have been apparent at the time to appellees.

Appellees were able to read and write, and had, on previous occasions, signed papers of a similar character. It is, of course, possible that some confusion may have resulted from passing the instruments from one to the other as they were signed, and that it was more or less difficult to keep an accurate check on the number. But, so far as the testimony shows, no

effort was made by the parties to ascertain the number of the instruments before signing them. It seems to us that the only possible deception that could have been practiced by Waples was that referred to in the testimony of James Rice with reference to the terms of the loan. It is difficult to conceive that a man of business experience would hazard an attempt to commit a fraud so open and aboveboard with customers of the intelligence of appellees. Treated purely as a commission, 1½ per cent for ten years was unjust and oppressive. Appellant claims, with reference to the matter, that interest rates at that time were high; that money was scarce; that the loan exceeded the amount usually permitted by insurance companies upon a farm of the size and value of the one in question; and that they were compelled to dispose of the paper in exchange for liberty bonds, which were not worth to exceed 90 per cent of their face value at par.

Evidence was also introduced by appellees for the purpose of showing the current rate of interest and commission charged on farm loans in Benton County at or about the time the loan in question was obtained. According to the testimony of these witnesses, the rate of 6 per cent and 1½ per cent commission for 10 years was excessive.

The difficulty with the whole transaction is that the evidence wholly fails to show that the execution of the notes in suit was induced by fraud, and it affirmatively appears that appellees were guilty of inexcusable negligence in failing to read the papers and know what they were signing. In brief, the most that can be said in favor of appellees in the transaction is that they signed the twenty $90 notes and the second mortgage without their knowledge and consent. In doing this, the means of information, which they did not use, was immediately before them, and this is the only way in which they signed the papers without their consent. No form of duress is claimed. Relief in equity from liability upon a written contract may be had, but the proof of the fraud must be clear and convincing. No such proof appears in the record. One who assumes the obligations of a written contract cannot shut his eyes and refuse to inform himself as to its contents, when it lies open and plain before him, and then invoke the aid of a court of equity to have that undone

which ordinary care and vigilance on his part would have prevented. To do so would be to trifle with contracts and to destroy their value whenever they proved unsatisfactory.

Reformation of the contract is prayed; but, according to the testimony of appellees, there is no contract to reform. The principal mortgage, note, and interest coupons attached were executed in strict conformity to the agreement, as claimed by both parties. Upon the theory of appellees, there was no agreement as to when or how the commission of $180 was to be paid. To grant relief upon the theory of reformation would involve the making of a new contract. This, the court will not undertake to do for the parties. If the evidence sustained the agreement as interpreted by appellees, no recovery could be had in this action in favor of appellant. This, however, is of no practical concern, as judgment might, upon such finding, have been entered upon the tender made.

2. REFORMATION OF INSTRUMENTS: right in general: total denial of contract.

It is also contended by appellees that the agreement to pay a commission of 1½ per cent for ten years, or in the aggregate $1,800, is unconscionable, and ought not, for that reason, to be enforced by a court of equity. The case must be determined upon other issues. According to the testimony of Waples, the notes and mortgage in suit do not strictly represent a commission, but that the loan was made out in the manner stated for convenience in handling. We are not inclined to wholly accept the testimony on this point. The loan was placed before the papers were executed, and it seems hardly probable that so large a discount was contemplated as that indicated by his testimony. Perhaps there was an element of speculation in the exchange of the loan for liberty bonds. The transaction must be considered as a whole. The agreement to pay 7½ per cent is not void because unconscionable. The rate thus indicated may be excessive, and probably the appellees could have obtained a loan at a more favorable rate, but the court cannot on this ground alone decree the cancellation of the notes and mortgage.

A careful reading and study of the record lead us to a different conclusion from that reached by the court below. We are persuaded that the proof fails to sustain the charge of fraud. The decree below is, therefore, reversed, and the cause remanded,

with directions to cause a decree to be entered in harmony with this opinion.—*Reversed and remanded.*

ARTHUR, C. J., DE GRAFF and VERMILION, JJ., concur.