LENA RAIBLE, Appellant, v. WILLIAM BERNSTEIN et al., Appellees.

No. 40073.

MARCH 11, 1930.

*Daniel W. Davis* and *C. C. Orvis,* for appellant.

*McCoy & McCoy, Irving C. Johnson,* and *William H. Keating,* for appellees.

GRIMM, J.—In January, 1928, the plaintiff filed a petition in the district court of Mahaska County, at law, seeking a judgment for $3,500 against Lena Raible Risney, plaintiff's granddaughter, and William Bernstein, a local realtor, claiming that, through a conspiracy between said defendants, and by their joint fraud and false representation, plaintiff had been induced to exchange a homestead she owned in the city of Oskaloosa for another property in the same place, to her damage in the sum of $3,500.

The defendant Lena Raible Risney, the granddaughter, in addition to her general denial, affirmatively pleads, in effect, that, sometime in the year 1920, the plaintiff voluntarily proposed to the defendant that, if the defendant would remain with her (plaintiff) and help take care of her during the remainder of plaintiff's life, she, the plaintiff, would convey to the granddaughter the homestead, for the labor, services, and care which the granddaughter would necessarily expend; and that the granddaughter accepted said proposition, and has fulfilled her contract with the plaintiff herein. She further pleads that it had been agreed between plaintiff and said defendant that the real estate might be sold or exchanged for other real estate more favorably located and modern, so that the plaintiff would be more comfortably situated, and would have more of the comforts of life and quiet than the location of the real estate then occupied; and that acting upon said agreement with the said plaintiff, and with the full knowledge and consent of the plaintiff, the said defendant exchanged said property with William Bernstein, her codefendant, for a complete modern home, known and described as Lot 8 in Burnside's Subdivision of Lot 5, Montgomery's Second Addition, at an agreed price of $2,250, and the exchange of the premises of the plaintiff on the basis of $1,250, Bernstein to assume and pay the mortgage of $350 as a part of the purchase price of said lot, leaving an equity of $900,—which, deducted from the $2,250, leaves a balance to be paid on the said home in Montgomery's Second Addition of $1,350, which is represented by a contract in writing, and payable at $25 per month until the whole amount of $1,350 is fully paid by the defendant. It is alleged on behalf of the defendant that said plaintiff had actual knowledge of and consented to the said exchange of property, and had also visited said property and inspected the

same, and voluntarily executed to this defendant the deed referred to in plaintiff's petition.

It appears that, on the 5th day of November, 1927, the plaintiff, who was then an old lady, a widow, and partially deaf, was the owner of a piece of property on which was located a house which she was occupying as the homestead, located in an unattractive portion of the city, adjacent to the railroad yards in the city of Oskaloosa, and which was the subject of the said agreement.

As stated, the defendant Lena Raible Risney was the granddaughter of the plaintiff, and had lived with the plaintiff for many years. She was the daughter of plaintiff's son, Fred M. Raible, and had lived with the plaintiff ever since she was four years of age,—a total of 29 years. This defendant was married, and had one child. It appears that the plaintiff was insolvent, except for her interest in the said home property. The plaintiff mortgaged the place, and there is an intimation that the proceeds thereof were given to the other children. The son Fred and the defendant Lena Risney apparently paid the interest on the mortgage, and also looked after the home, and provided a living for the plaintiff.

The property thus occupied was in close proximity to the gas works of Oskaloosa, and also near the railroad yards. As a home, it was undesirable. There were no modern improvements in it. Furthermore, the defendant's daughter, the great-granddaughter of the plaintiff, was almost of school age, and the entire situation furnished an uninviting background to a school career. An arrangement had been entered into, whereby the plaintiff was to deed the property, subject to the mortgage, to the defendant Risney, and Risney was, in turn, to deed the property to William Bernstein, in exchange for another property, differently and better located, the title to which was to be taken by the defendant Risney.

This cause of action is bottomed upon the proposition that the granddaughter and Bernstein entered into a conspiracy, whereby they defrauded the plaintiff out of her homestead, to her damage in the sum of $3,500. It is the contention of the plaintiff, and she so testified, that, on the 5th day of November, 1927, William Bernstein came to the home; that Lena Risney and Bernstein talked for a few minutes, no part of which con-

versation the plaintiff heard, whereupon the plaintiff was told by them to go with them uptown in Bernstein's car. They all went together, Mr. Bernstein driving the car. The plaintiff testified:

"They told me they were going to town to have me sign some papers as a witness. William Bernstein nor Lena Risney never talked to me about selling the property [homestead], or making any deed. We went up to Mr. Keating's office. Lena Risney went in with me to the office. Defendants did not say anything to me until we got to Keating's office. They never talked to me about selling or disposing of my property and deeding it away to anyone. Did not know, when I signed my name in Keating's office, that I was signing a deed to Lena Raible Risney to the property on South H Street. When we got to Keating's office, Mr. Keating came with a paper, and handed it to me and motioned for me. That was all, and nothing said to him."

The plaintiff claims that afterwards they moved her into the new home, where she continued to live with her granddaughter and great-granddaughter. On November 1st of the same year, four days prior to this transaction, the plaintiff wrote a letter to her son Fred, which contained, among other things, the following:

"I will now write you an important letter which I leave you to consider. Bernstein had a house again that he wants to sell Lee [granddaughter], and I ask your advise this property use to belong to Dan Davis the lawyer when he lived with his first wife. * * * I forgot the price he wants but enyway he wants to give me 1220 hundred and fifty for mine to trade in I told her sometime ago that if you were willing and she could trade allright that I would give her the home she bought and let mine in but I might as well give it away as such a trade I know this much she would have to pay him 300 dollars down and balance in rent that means a thousand dollars for her to pay."

On the same day, November 1, 1927, Lena Risney wrote a long letter to her father, Fred M. Raible, describing in detail the proposed trade, and it contained, among other things, the following:

"I think that grandmother has been worrying a little lately about that mortgage. She approached me, the other day, with the proposition that, with your consent, and in consideration that I would take care of the mortgage, she would deed the place over to me, so that I might trade it in on another place in a better location and closer to school."

The move was made after November 5, 1927, and on December 1, 1927, the plaintiff, in writing to her son, said, among other things:

"I am awful lonesome since I left my home everything is all right but I feel like I was in another town."

Incidentally, it is to be noted that the plaintiff continued to live with the granddaughter in the new home, and permitted the granddaughter to care for her, under the agreement. It is quite apparent from the record that the real complaint comes not from the plaintiff, but from the daughter Mrs. Wells and the plaintiff's son William, who, as it is claimed, had, up to the time of the trade of properties, been profiting by the mortgage placed upon the premises by the plaintiff.

At the close of plaintiff's evidence, the court directed a verdict for the defendants.

I. There is here no dispute but that the plaintiff signed the deed conveying the old homestead to her granddaughter, one of the defendants. There is no evidence whatever that any-thing was done to prevent the plaintiff from reading the instrument, before and at the time she signed the same. She did not attempt to read the instrument, nor did she ask anyone to read it for her. It will be noted that it was not either of the defendants in this case who presented the instrument to the plaintiff for signature, but a Mr. Keating, in whose office the transaction took place. The plaintiff does not claim that Keating said anything to her by which she was misled in signing the instrument. She had every opportunity to examine it. She was able to read, and made no effort to read the instrument herself, nor did she ask anyone else to read it for her. As has been said by this court in *Shores-Mueller Co. v. Lonning*, 159 Iowa 95:

"As a rule, if a party is able to read, and has a chance to do so, but omits this precaution because of his adversaries' statements as to the contents of the instrument, his negligence will estop him from claiming that the instrument is not binding."

See, also, *Bannister v. McIntire*, 112 Iowa 600; *Reid, Murdock & Co. v. Bradley*, 105 Iowa 220; *Wallace v. Chicago, St. P., M. & O. R. Co.*, 67 Iowa 547; *Gulliher v. C., R. I. & P. R. Co.*, 59 Iowa 416; *Midland Mtg. Co. v. Rice*, 197 Iowa 711.

The record does not show that anything was said to the plaintiff in the office of Mr. Keating in reference to this instrument. The plaintiff does not even claim that she understood she was merely signing as a witness. She does testify that she did not know what paper she signed until a couple of days afterwards, which was after they had moved into the new property. Certainly there is no evidence that she was prevented from reading the instrument, and equally certain it is that Mr. Keating, who presented the instrument to her for signature, did not mislead her in any way, nor did he by any trick or artifice prevent her from examining the instrument, nor lead her to believe that it was any instrument different from what it proved to be. There is here, on the facts, no question of a document's being signed on the basis of acts growing out of confidential relations or the abuse thereof.

II. We now come to the question whether the court should have directed a verdict or submitted the case to the jury. The plaintiff frankly admits having written the two letters hereinbefore set forth. She does not dispute the contents thereof. She does not offer any explanation in relation thereto. She makes no claim that these letters did not refer to the properties in question and the parties with whom she dealt in relation thereto. This being true, the letters conclusively establish the following facts:

1. The plaintiff was willing that the trade should be made, and that the title to the new property should be taken in the granddaughter; and the plaintiff's property was to pass in partial payment for the new home, the granddaughter being required to pay the balance of the payments.

2. After she had moved into the new property, she was

satisfied. "Everything is allright but I feel like I was in another town."

The only reasonable inference to be drawn from the foregoing is that the plaintiff knew she was signing a deed to her property at Keating's office; she knew she was transferring the property in exchange for a new and better home, which was to become the property of her granddaughter, and in which she, the plaintiff was to live with the granddaughter, the granddaughter having obligated herself to pay the additional purchase price over and above the value of the old home which was traded in.

It clearly appears that she acquiesced in the transaction, and moved into the home, and lived there for several months before this suit was started. In fact, she was living there at the time of the trial, more than a year after the deed was signed and the exchange of property was completed. In the face of these letters, admitted to have been written by the plaintiff, and remaining undenied and unexplained, there was, under the well established rule in Iowa, no issue to be submitted to the jury on the question of the knowledge of the plaintiff concerning the transaction. *Meyer & Bros. v. Houck,* 85 Iowa 319; *Cherry v. Des Moines Leader,* 114 Iowa 298; *Schmidt v. Hayden,* 205 Iowa 1369.

The only evidence on the part of the plaintiff bearing upon her charge of conspiracy and fraud is the mere statement that she was told, before going to Keating's office, that she was wanted there to sign a paper as a witness. There is no evidence that she believed this statement alleged to have been made by the defendants. There is no claim that she relied thereon. The plaintiff rested her case upon the mere statement that the defendants asked her to sign an instrument as a witness. She did not testify that she believed the representations that they wanted her to sign the instrument as a witness, or that she relied on that statement. Her failure to testify or establish that she signed the deed believing the alleged representations of the defendant, and that she relied thereon, defeats any right of recovery on that basis. The plaintiff has utterly failed to sustain her charge of conspiracy as between the defendants. Under all these circumstances, had a verdict been returned for the plaintiff, it would have been the duty of the court to set it aside; and under such

circumstances, it was the duty of the court to direct a verdict for the defendants. In so doing there was no error, and the case must be, and is,—*Affirmed.*

MORLING, C. J., and EVANS, FAVILLE, and KINDIG, JJ., concur.