R. R. GRIFFITHS, Appellant, v. C. C. BROOKS, JR., et al., Appellees.

No. 44885.

JANUARY 16, 1940.

REHEARING DENIED MAY 18, 1940.

Howard L. Bump, for appellant.

Hanke & Stevens, for appellees.

RICHARDS, J.—The controversy to be decided is one between plaintiff and defendant Brooks. But certain transactions between plaintiff and defendant Stevens have such relationship thereto that it may be well to make mention of them at the outset.

In January 1938 Stevens agreed to sell to plaintiff a new Pontiac automobile for $1,009.80 (inclusive of sales tax), of which amount plaintiff agreed to pay $709.80 on May 1, 1938, the date on which Stevens agreed to deliver the car. The remaining $300 of the purchase price plaintiff paid to Stevens when the contract was made or within a day or two thereafter, by turning over to Stevens two old automobiles. In February 1938 Stevens prevailed on plaintiff to pay him $350, Stevens holding out the inducement that in consideration of being paid  the $350 he would credit $375 on the $709.80 due May 1, 1938. But when May 1st arrived Stevens neither delivered the Pon-

tiac nor returned any of the money or property, nor did he thereafter do either of these things. Prior to these dealings between Stevens and plaintiff, the latter, in a conversation with Brooks, had said that he was intending to buy a new car and desired to trade in the two old automobiles, and Brooks had stated to plaintiff he would send him a man who would make him a good deal. Brooks told Stevens of this conversation and there ensued the transactions between Stevens and plaintiff already described. Plaintiff was a dairyman, and upon his property Brooks had long been writing all the insurance. The two had been well acquainted for many years. In addition to his insurance business Brooks was president of a company engaged in financing loans on automobiles. Soon after contracting with Stevens plaintiff asked Brooks' opinion as to whether it would be safe to deliver the old automobiles to Stevens, and Brooks answered he thought it would be. But plaintiff made the $350 payment without any advising with Brooks, and when plaintiff told Brooks the payment had been made the latter stated it was his opinion that plaintiff had not exercised good judgment. When on about May 1st it became apparent that though Stevens had procured the old cars and the $350, nothing was being realized in return, plaintiff consulted his attorney and then again contacted Brooks. There is sharp controversy as to what conversations then took place. Plaintiff testified that Brooks said, "I am a little short of money, but I will see that you get your car, you will not lose a dime". Plaintiff's hired man related that Brooks made a statement of similar import sometime in the spring of 1938. Brooks as a witness denied saying any of these things. He testified that when plaintiff came to see him on about May 1st he (Brooks) phoned Stevens and tried to induce him to carry out his contract with plaintiff, and that upon being told by Stevens that the latter did not have the necessary funds he, Brooks, advised plaintiff that the only way he could get his automobile would be to have a contract secured by the automobile or by having Stevens sign a contract and pay for it by the month.

However, what the parties actually did is not in dispute. That is, on Sunday, May 15, 1938, plaintiff and Brooks went to the place of business of a Pontiac dealer in Renwick, Iowa. There Brooks procured from the dealer a Pontiac at the wholesale price of $880.77, and the car was turned over to plaintiff,

who drove it back to his home in Des Moines. The retail price of this car was $1,090.85 instead of the $1,009.80 that was the retail price (inclusive of sales tax) of the car Stevens had agreed to sell, the difference being that the car plaintiff acquired was a "deluxe" model, the other was "standard". On the following day, May 16, 1938, Brooks and plaintiff met at the latter's home and there occurred the transaction on which plaintiff's cause of action is predicated. The purpose of the conference was to make settlement for the transaction of the day before, that is the acquiring of the car by plaintiff at Renwick. And it may at this point be said that a fundamental dispute between the parties is whether Brooks in what he did was merely complying with a request from plaintiff for aid because of his predicament, or whether, as plaintiff claims, Brooks was assuming personal liability for the Stevens contract and was bearing the loss plaintiff had suffered by reason of Stevens having procured and kept plaintiff's property and money. During this conference of May 16, 1938, plaintiff signed a check payable to Brooks for $415.85, and a conditional sales contract reciting that a balance of $506.76 of the purchase price constituted a lien upon the car. He also signed a note for the $506.76. It appears that Stevens afterwards added his signature to the note but no defense predicated thereon is before us. Brooks assigned the contract and note to a bank and used the proceeds toward paying the Renwick dealer for the car. Thereafter plaintiff brought this action against Brooks for damages in the amount of the note and conditional sales contract, alleging that the signing of the note and contract by plaintiff was fraudulently procured by Brooks, in that plaintiff did not have his glasses with him and consequently was unable to read what he signed, and in that at no time during the transaction did Brooks represent to plaintiff that he would be required to give a conditional sales contract or note, and in that plaintiff would not have signe the instruments except for the false and fraudulent represen tions made by Brooks that the paper he was signing was a mal order blank for the car, and in that plaintiff owed n Brooks nor Stevens any sum of money for the reason paid the full purchase price in cash and in property. close of all the testimony Brooks moved that a verdict be direct in his favor against plaintiff. The motion was sustained and a judgment entered. Plaintiff appealed.

Error is predicated upon the ruling on the motion. Its first ground was that fraud on part of Brooks was not shown, in that no art or artifice was practiced by him, and plaintiff was not prevented from reading the instruments, the evidence showing affirmatively that plaintiff could read and write the English language and had the opportunity to read the instruments before he signed them and failed to do so, and his failure was due to his own negligence.

One of plaintiff's allegations, to the effect that Brooks represented that the paper being signed was a formal order blank for the car, may be eliminated from consideration because it has no support in the evidence. With respect to the allegation that Brooks at no time represented to plaintiff that he would be required to give a conditional sales contract or note, the testimony of plaintiff and of Brooks is at variance. But it is unquestioned that during the conference, at which plaintiff signed the contract and the note, Brooks made out and submitted to plaintiff a "work sheet". Upon this paper, introduced as Exhibit 1, are several computations consisting of columns or groups of figures. And though figures only, without words, appear in Exhibit 1, one may easily find on the work sheet a computation by which the exact amount of the check that plaintiff signed was derived, as well as a computation that resulted in the determination of another exact amount, and this was the amount for which the note and conditional sales contract were given. And from this work sheet it is further evident that the conditional sales contract and note for $506.76 were in an amount that plaintiff would necessarily borrow by the financing method in order to settle for the car that was delivered to him at Renwick at wholesale cost, assuming that the losses from his dealings with Stevens were to be borne by plaintiff. And it also appears from Exhibit 1 that because plaintiff acquired the car Renwick at wholesale the loss caused by Stevens was materially reduced in addition a car of larger value having been ired. On the other ha if it be assumed that Brooks was rsing plaintiff on account of the loss from his dealings evens, and in addition was substituting to the advantage plaintiff a more valuable car than Stevens had agreed sell, then the check for $415.85 would have been the extent of plaintiff's liability for the Renwick car. These references to the work sheet, Exhibit 1, which Brooks left in the possession

of plaintiff at the end of the conference, make it evident that it is at least controversial whether Brooks failed to acquaint plaintiff with the fact that he was signing a note and conditional sales contract representing a part of the purchase price of a higher priced car at a reduced price that salvaged a part of plaintiff's loss, all without profit to Brooks.

But if we look upon it as a jury question whether the work sheet informed plaintiff of the nature of the instruments he was signing, nevertheless plaintiff would have informed himself had he but read the instruments. Upon the trial his reasons for failing so to do, as shown by the testimony, were these: First, he did not have his glasses, second, he thought he was signing an ordinary order for the car and he trusted Brooks not to have him (plaintiff) sign something he "really did not know". With respect to the first reason plaintiff admitted, "I could have read them (the note and conditional sales contract) by getting my glasses and taking time to do so". He admits he read the check without his glasses by taking it into a better light. He makes no claim that he could not read the figures that appeared on the work sheet. As to the second reason, there is no evidence that Brooks in any way held out that it was an order that was being signed, and plaintiff's thought in that regard was something he himself evolved. He asserts that what he thought and his trust in Brooks and his not having his glasses constituted sufficient reasons for his voluntary failure to acquaint himself with the nature of the instruments, and this in the absence of any showing of affirmative artifices or legerdemain, or even false statements of fact on part of Brooks. Under such a factual situation, in order to be in accord with our prior pronouncements, it is necessary to hold that plaintiff's reasons afforded an insufficient excuse for his failure to avail himself of the means he had at hand, i. e., the very writings in which the information reposed. In Legler v. West Side M. F. Ins. Assn., 214 Iowa 937, 939, 243 N. W. 157, 158, an insured claimed his signature to proofs of loss had been procured by fraud and deceit. He could read and write and was a man of ordinary business capacity, as is true of plaintiff in the instant case. From the opinion: "He [insured] says that he did not have his glasses with him, but this in itself is not sufficient." Some further claims made by the insured were that it was understood and agreed that the proofs of loss did not

represent a full settlement, that when he signed the proofs he had not had opportunity to inventory the articles lost in the fire, and that the insurance company practiced fraud and deceit by securing his signature to the papers containing statements of full satisfaction, the same being contrary to the understanding and agreement between the parties at the time of the signing of the proofs of loss. The opinion says at page 940:

"In a general way, this is the substance of his [insured's] testimony. It does not measure up to the standard of proof required from him, under these circumstances, to warrant a court or jury in holding that fraud or deceit had been practiced upon him in procuring his signature to these two proofs of loss. The duty of one signing an instrument to read the same before such signing has been the subject of a long line of decisions in this court. We settled the rule quite definitely that if the opposite party does not do something in an affirmative way to prevent the party signing from reading the same, then he signs at his peril and is bound by the same. See McLean v. American Mutual Fire Ins. Co., 122 Iowa 355 [98 N. W. 146]; Midland Mortgage Co. v. Rice, 197 Iowa 711 [198 N. W. 24]; Charlson v. Farmers State Bank, 201 Iowa 120 [206 N. W. 812]; Williams v. Farmers Mutual Hail Ins. Assn., 204 Iowa 991 [216 N. W. 269]; Raible v. Bernstein, 209 Iowa 1083 [229 N. W. 753], and cases there cited."

In the instant case the tendency of all Brooks' affirmative acts during the conference was in the direction of informing plaintiff of the nature of the instruments he was signing, as pointed out above in discussing Exhibit 1. It is true, as stated by plaintiff, that courts look upon fraud with abhorrence and are reluctant in any case to permit a cheater to profit by his wrongdoing. (In saying this we intend no inference respecting the quality of Brooks' acts. That is not before us to decide.) But at the same time courts are constrained, by another consideration that is for the public welfare, from affording parties to written agreements such ready avenues of escape from their obligations that the purpose of lastingly recording such obligations in writings would be quite indifferently attained. The aim is to follow a rule that will minimize both evils without accentuating either of them. We are of the opinion that plaintiff's own doings were, in view of the circumstances and facts

shown, such that he may not now press the claim that his signatures to the conditional sales contract and note were procured by fraud and deceit. It follows that the first ground of the motion warranted the ruling thereon. The judgment of the trial court is affirmed.—Affirmed.

CHIEF JUSTICE and all JUSTICES concur.