**Max ROCHHOLZ et al., Appellants,**

v.

**Frank L. FARRAR and Robert R. Kruger, Appellees.**

No. 75–1723.

United States Court of Appeals, Eighth Circuit.

Submitted April 15, 1976.

Decided Dec. 28, 1976.

Theodore T. Duffield, Des Moines, Iowa, for appellants.

Donald A. Wine, Des Moines, Iowa, for appellees.

Before LAY and WEBSTER, Circuit Judges, and URBOM, District Judge.[*]

WEBSTER, Circuit Judge.

█ This is an appeal from the judgment of the District Court[1] denying equitable rescission of a written agreement by appellants to sell the controlling interest in the Exchange State Bank of Adair, Iowa. Jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332(a); the law of Iowa controls the outcome of this case.

The Exchange State Bank was for many years owned and operated by the Rochholz family. Due to unrelated circumstances, sale of the bank became necessary in 1971. At that time, appellants Dean Rochholz, Max Rochholz and Ila Fay, brothers and sister, owned 985 of the 1,000 shares in the bank. On March 3, 1971, the Rochholz brothers met with appellee Robert Kruger to negotiate a contract for the sale of the bank. Kruger wrote out the terms of the proposed contract, which was typed by Max Rochholz and signed by all parties present and on behalf of the sister. Kruger paid two thousand dollars at that time and closing was set for March 15.

The agreement of March 3 provided in part:

4. Sellers will guarantee loans in said Bank to be good and collectible. Classified loans until paid and all notes until paid or renewed will be guaranteed with all losses to be deducted from payments due sellers by buyers.

\* \* \* \* \* \*

7. During contract agreement any recoveries from Charge Offs will be paid to Sellers on Charge Offs after closing.[2]

Appellee Frank Farrar, an attorney and investor in banks, did not learn of the agreement until after the March 3 meeting. Apparently Kruger intended to interest Farrar in purchasing the bank with him, and between March 3 and March 10 they studied the bank and explored financing the purchase. On March 10, Farrar accompanied Kruger to the bank to inform the Rochholz brothers that performance of the contract as written would be impossible. At the March 10 meeting, a new agreement which had been prepared by Farrar was discussed and ultimately signed.

In addition to a modification of the purchase price, the new agreement contained the following provision relating to guaranteed loans and "charge offs":

4. In addition to the warranties contained in Paragraph 3 hereof, the Sellers, individually and collectively, guarantee to the Buyers all of the loan receivable accounts of the Exchange State Bank existing on the date of closing as provided for herein. In the case of classified loans, this guarantee shall apply until the full amount of the loans have been paid regardless of any extensions or renewals thereof. In the case of all the other loans, this guarantee shall apply until the full amount of the loans have been paid or until they have been renewed, whichever occurs first. Any additions or increases in said loans after the date of settlement are not guaranteed by the Sellers. Whenever any of the loans guaranteed herein are required to be charged off the books of Exchange State Bank by either federal or state bank examiners or under the accounting procedures regularly employed by the Exchange State Bank,

---

* The Honorable Warren K. Urbom, Chief District Judge, United States District Court for the District of Nebraska, sitting by designation.

1. The Honorable William C. Stuart, United States District Court for the Southern District of Iowa.

2. A "charge off" occurs when a loan is determined to be uncollectible. The amount charged off is then carried in the bad debt account and not as a general ledger asset on the books of the bank.

the amount thus written off shall be credited on a pro-rata basis against the principal and interest amounts payable to the Sellers under Paragraph 2 hereof on the date of said charge off and applied to the payments that are first due. Any subsequent amounts collected by the Exchange State Bank on guaranteed loans charged off in the manner aforesaid shall be credited to the Sellers on a pro rata basis to the extent of the amount owing under Paragraph 2 and to the extent of the charge off and not to exceed the balance owing the Sellers. All other charge offs belong to the Buyers. The Sellers shall have the right to inspect the books of the Exchange State Bank as they pertain to said charge offs or add back of loans or collections, as the case may be, but the decision on whether any of the guaranteed loans shall be charged off and the date thereof shall be within the exclusive discretion of the Exchange State Bank.

Appellants signed the March 10 agreement after Farrar and Kruger left the room for some fifteen minutes to give them a chance to study the provisions of the new contract. When a dispute in accounting arose after closing, appellants brought an action in the District Court seeking declaratory relief, damages for breach of contract, and rescission. The underlying claim is based upon fraud in the inducement to execute the March 10 agreement.

■ At trial, appellants testified that they signed the March 10 agreement only after having been assured by appellees that payments on loans charged off before closing would be treated the same under the new agreement as in the March 3 agreement, which they understood provided that such payments would offset guaranteed loans charged off after closing. The Dis-

trict Court denied appellants' claim for breach of contract and likewise denied rescission, holding that under Iowa law appellants' negligence in failing to study the unambiguous terms of the agreement precluded them from obtaining rescission of the agreement. Appellants challenge both of these rulings.[3]

## I

■ The District Court found paragraph 4 of the March 10, 1971 agreement to be unambiguous as a matter of law. We agree. Paragraph 4 limited the sellers' guarantee to the loan receivable accounts of the bank "existing on the date of the closing . . .." It did not apply to any subsequent "additions or increases in said loans . . .." In the event of a lawful charge off against any such guaranteed loans, the same amount became a credit against the unpaid purchase price, thus effectuating the guarantee. Correspondingly, appellants were entitled to credit for all sums collected on "guaranteed loans" to the extent of any prior charge off, not to exceed the balance due the sellers on the purchase price. "All other charge offs belong to the Buyers." It is clear from a reading of paragraph 4 alone and in context with the other provisions of the March 10 agreement that appellants retained no interest in any charge offs of loans not guaranteed by them, nor was the purchase price to be increased by the amount of any collections made on account of such loans. Loans charged off before closing were not guaranteed by appellants, and hence the District Court properly held that they had no interest in payments made on account thereof.

■ From this finding, the District Court concluded that no action could lie for damages from breach of contract since no breach was established. It therefore did

**3.** Appellants assert as a third contention of error that the District Court improperly permitted an advisory jury to consider the affirmative defense of the negligence of appellants. The point was not argued and is without merit. The burden of proving fraud by appellees required a showing of reasonable reliance by appellants; thus their negligence was not an affirmative defense required to be pleaded, see Fed.R.Civ.P. 8(c), but was in issue from the inception of the complaint.

not submit this issue to the jury. With this conclusion we likewise agree.[4]

## II

■■■ The more difficult question is whether appellants were entitled to a rescission of the agreement because of the misrepresentations of the buyers, appellees herein. The District Court adopted the findings of its advisory jury[5] and expressly found that appellants believed that under the March 10 agreement they would be entitled to receive credit for all sums collected on loans charged off prior to closing against their liability for loans charged off after closing. It also found that at least one appellee had so represented the meaning and effect of the March 10 agreement. This latter finding was disputed by appellees, and at trial Frank Farrar testified to the contrary. There was substantial evidence to support the findings of the District Court, however, and we cannot say that such findings were clearly erroneous. Thus an arguable foundation was laid for reformation of the contract.[6] Appellants, however, did not seek reformation; rather, they sought rescission.

The District Court also found that appellants did not act as reasonable and prudent persons in their examination of the March 10 agreement and had they done so they would have had a materially different belief as to its meaning. There is substantial evidence in the record to support the conclusion that appellants simply relied upon the assurances of appellees that in respect to charge offs the provisions differed from the March 3 agreement only to the extent of limiting credits for payments to the balance due from appellants.

There was no evidence that appellants relied upon a factual misstatement of content, such as exists when a party signs a new draft without making a comparison with the old draft because the party who prepared the draft has misrepresented that both drafts are identical, whereas in fact material new language has been added or old language has been deleted. *Christensen v. Harris,* 190 Iowa 256, 180 N.W. 325 (1920). *See Betz v. Swanson,* 200 Iowa 824, 827, 205 N.W. 507, 509 (1925). Rather, in this case appellants knew that a change had been made in the agreement and that it affected charge offs; their reliance was upon appellees' representations about the *effect* of the change. No trick or artifice was employed to prevent their reading the new agreement. *See Merriam v. Leeper,* 192 Iowa 587, 185 N.W. 134 (1921). The negotiations were actually recessed and appellees left the building in order to give appellants an opportunity to study the revised agreement, discuss its contents and, if they wished, consult with counsel. The District Court concluded from these facts that appellants were negligent in failing to make a reasonable examination of the draft before signing it. Under traditional Iowa law this negligence bars recovery by parties seeking to avoid a contract on grounds of fraudulent inducement. *See Small v. Ogden,* 259 Iowa 1126, 147 N.W.2d 18 (1966); *Syester v. Banta,* 257 Iowa 613, 133 N.W.2d 666 (1965); *Schlosser v. Van Dusseldorp,* 251 Iowa 521, 101 N.W.2d 715 (1960); *Preston v. Howell,* 219 Iowa 230, 257 N.W. 415, 418, 97 A.L.R. 1140 (1934); *Merriam v. Leeper, supra,* 192 Iowa at 593, 185 N.W. at 137; *Lillie v. Shriver,* 190 Iowa 861, 179 N.W. 632, 633 (1920). *See also United States v. Tholen,* 186 F.Supp. 346, 363 (N.D.

---

4. We decline appellants' invitation to create an ambiguity in an otherwise unambiguous clause by resort to parol evidence. *See Bennett v. First National Bank of Hambolt, Iowa,* 443 F.2d 518, 520 (8th Cir. 1971).

5. The factual issues were submitted upon written interrogatories.

6. The Restatement of Contracts § 505 (1932) provides:

§ 505. Reformation Where a Mistake of One Party Is Known to the Other.
Except as stated in §§ 506, 509–511, if one party at the time of the execution of a written instrument knows not only that the writing does not accurately express the intention of the other party as to the terms to be embodied therein, but knows what that intention is, the latter can have the writing reformed so that it will express that intention.

Iowa 1960); *Rasmus v. A.O. Smith Corp.*, 158 F.Supp. 70, 85 (N.D.Iowa 1958).[7]

The District Court elected to follow the traditional line of cases and rejected appellant's claim for rescission. At the same time it expressed concern about the possible effect of a number of Iowa decisions suggesting that a contract may be reformed when there is mistake, accident or inadvertence by a defrauded party. *See, e. g., Schuknecht v. Western Mutual Insurance Co.*, 203 N.W.2d 605, 608 (Iowa 1973); *Akkerman v. Gersema*, 260 Iowa 432, 149 N.W.2d 856 (1967) (signing party held entitled to rely upon accuracy of reexecuted lease; his mistake was not culpable negligence and entitled him to reformation of the contract where the scrivener had not correctly stated the mutual assent of the parties).

We have examined these cases and agree with the District Court that they are inapplicable to the present case. In both *Schuknecht* and *Akkerman* the misled party sought to reform, not rescind the agreement.[8] Judge Stuart drew a sharp distinction between mistake and negligence. He wrote:

> One can act reasonably under all the circumstances and still make a mistake. In such a situation, equity will generally not deny relief in the face of fraud. But where one has acted unreasonably, the

balance shifts, and no relief is warranted for one who had the ability to prevent the injury but simply failed to take reasonable actions to do so.

He observed further that this was not an adhesion contract; "the parties were all businessmen, knowledgeable in the ways of the world." In this Circuit, we accord great weight to the interpretation of state law by the District Court. *Lienemann v. State Farm Mutual Auto Fire and Casualty Co.*, 540 F.2d 333, 342 (8th Cir. 1976). The judge of the District Court in this case is a distinguished former member of Iowa's highest court, and we find no basis to dispute his analysis of the current state of the law of rescission in Iowa or his conclusion that the Supreme Court of Iowa, if faced with this problem today, would deny relief to a claimant who negligently relied upon the interpretation of a written instrument offered by the other party as a substitute for his own clear opportunity to read it and draw his own conclusions as to its plain meaning.

Affirmed.

---

**7.** So strong is the duty to inspect and read a document before signing it under Iowa law that it has even been held that the absence of glasses necessary for reading will not excuse the failure to read. *Griffiths v. Brooks*, 227 Iowa 966, 289 N.W. 715 (1940). One who cannot read will ordinarily be barred from relying on this impediment when he had an opportunity but failed to have the instrument read to him. *Shores-Mueller Co. v. Lonning*, 159 Iowa 95, 140 N.W. 197, 199 (1913).

**8.** In *International Milling Co. v. Gisch*, 258 Iowa 63, 137 N.W.2d 625 (1965), a signing party asserting damages for fraud did read the instrument, questioned its effect and then signed after being reassured by the other party as to the scope of his liability. The Iowa Supreme Court held that it was error to have directed a verdict against the signing party since a fact issue had been presented as to whether the statements were a promise of future conduct (and therefore not fraudulent) or

were misrepresentations of an existing fact. It remanded the case for a new trial.

The court stated that even though the signing party had been alerted and reassured, he was not precluded as a matter of law from recovering damages based on the false representations, since such a question is ordinarily for jury determination. 137 N.W.2d at 631. The majority opinion in *Gisch* never reached the legal issue of whether such conduct amounted to negligence which would bar recovery under Iowa law, since a new trial was necessary to determine the factual issue of negligence in the first instance. Its holding is not inconsistent with the action taken by the District Court in this case. Judge Stuart adopted as his own finding of fact the advisory jury's finding that appellants did not act reasonably under all the circumstances. It was on this factual finding that he concluded appellants were barred from recovery under Iowa law.